# IN THE COURT OF APPEALS OF IOWA

No. 18-1808
Filed July 24, 2019

IN RE THE MARRIAGE OF PAMELA LOUISE PARLEE
AND JONATHAN DAVID PARLEE

Upon the Petition of
PAMELA LOUISE PARLEE,
        Petitioner-Appellee,

And Concerning
JONATHAN DAVID PARLEE,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.


        Jonathan Parlee appeals the support and economic provisions of the
decree dissolving his marriage to Pamela Parlee.  **AFFIRMED.**


        Tyler Phelan and Eric Borseth of Borseth Law Office, Altoona, for appellant.

        Jaclyn M. Zimmerman of Miller, Zimmerman, & Evans, P.L.C., Des Moines,
for appellee.


        Considered by Mullins, P.J., Bower, J., and Vogel, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**BOWER, Judge.**

Jonathan (Jon) Parlee appeals the economic and spousal support provisions of the decree dissolving his marriage to Pamela (Pam) Parlee. Jon asserts the district court miscalculated the parties' income, resulting in an inequitable spousal support award. He also objects to the court's valuations of property items, the property distribution, and the award of trial attorney fees. Finally, he requests an award of appellate attorney fees. Pam waived filing an appellate brief, relying on the trial court's findings and conclusions.[1]

We find no reason to provide a detailed background of facts because the trial court has done so in its thirty-page decree. The court carefully considered the parties' positions and correctly applied the law. On our de novo review, we find no failure to do equity and therefore affirm.[2]

Jon and Pam were married in 1982 and have two adult children. The court ordered Jon to pay Pam traditional alimony of $1321.49 per month,[3] finding Pam "should not be financially penalized for her unsuccessful attempt to preserve the marriage" by reducing her work schedule. On this issue, the trial court found:

---

[1] *See White v. Harper*, 807 N.W.2d 289, 292 (Iowa Ct. App. 2011) (noting an appellee failing to file a brief does not require reversal; "we will not search the record for a theory to uphold the decision of the district court," and we confine ourselves to the objections raised by the appellant).

[2] *See In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016) (noting standard of review). In a de novo review, "we examine the entire record and decide anew the issues properly presented." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). Especially when considering the credibility of witnesses, we give weight to the factual findings of the district court, but are not bound by them. Iowa R. App. P. 6.904(3)(g).

[3] The court included this parenthetical: "($19.06 x 16 = $304.96; $304.96 x 52 = $15,857.92; $15,857.92 % 12 = $1321.49)." While we are not entirely sure how the district court's mathematical formula was meant to be used, we note our courts are not authorized to employ a fixed mathematical formula in determining spousal support. *See Mauer*, 874 N.W.2d at 107 ("The legislature has not authorized Iowa courts to employ any fixed or mathematical formula in applying spousal support.").

In recent history Pam and Jon's work schedules were not parallel. [(Jon worked 2:00 to 10:00 p.m. on Monday, Thursday, Friday, Saturday, and Sunday. Pam worked 7:30 a.m. to 5:30 p.m. on Monday through Friday.)] Both parties testified that Pam had discussed decreasing her work hours with Jon and Jon agreed. Pam testified that she was concerned that the marriage was breaking apart. She hoped spending one day a week with Jon on his day off would be a chance for the parties to work on saving their relationship. Pam changed her work schedule from full-time to accommodate her expectations.

Spending more time together didn't work. Once Pam realized the marriage was over, she asked her employer to reinstate her to full-time. This wasn't possible because the fulltime position had already been filled. Pam sought supplemental employment. No other job would pay her anything close to the $19.06 she earns in her present capacity. This is the highest hourly compensation rate Pam has ever earned. She testified that she didn't want to lose her higher earning capacity simply to have full-time hours at lower pay somewhere else. She has been diligent but unsuccessful in finding supplemental employment because her availability is only Mondays and Tuesdays.

The district court awarded Pam spousal support based on:

(1) Pam's recent reduction in her work schedule at her highest earning capacity, which the court finds Jon knew about and was in agreement with; (2) Jon's consistently higher income during each year of the parties' long marriage; (3) Pam's lesser earning capacity and lesser level of education; and (4) the unlikely possibility that Pam can support herself at the standard of living she enjoyed during the marriage.

Courts are instructed to equitably award spousal support by considering each of the statutory criteria of Iowa Code section 598.21A(1) (2018). *See In re Marriage of Gust*, 858 N.W.2d 402, 410–12 (Iowa 2015). The district court did so here, and we find no failure to do equity in the spousal support awarded. *See Mauer*, 874 N.W.2d at 106 ("[W]e will disturb a district court determination [in a dissolution proceeding] only when there has been a failure to do equity.").

The trial court correctly noted the statutory factors used to determine an equitable distribution of marital assets and spousal support and analyzed those

factors. At the time of the trial, the parties had been married for thirty-five years. Both were in their fifties, and the trial court found both were in "fair" health. Neither had advanced degrees at the time of marriage. Both parties worked fulltime throughout the marriage, with Pam earning significantly less than Jon.

At the time of trial, due to the reduction to an approximate thirty-two hour work week, "Pam [was] on pace to earn $33,782 in gross wages in calendar year 2018." She had monthly expenses of $3708.66.

Jon's amended financial affidavit was based an annual income of $69,324, which the trial court found was not indicative of actual his earnings because it did not include his shift or weekend differentials or his overtime pay. Jon's annual income is consistently more than his base pay, and we find the court's extrapolation of his earnings in the amount of $83,887 was supported by the evidence presented.[4] He listed monthly expenses of $3653.54. The parties' annual incomes differ by $50,000.

The court discussed the value of parties' retirement accounts and distributed them equitably:

---

[4] As found by the court,

> Jon is on pace to earn $83,887 in gross wages in calendar year 2018. He has worked overtime during his career at USPS. Jon's overtime is not guaranteed but has been regular and consistent throughout his career. Jon's current annual salary is $69,327. He receives additional income due to his shift differential and weekend pay. Jon's gross income as of the third pay cycle in 2018 was $9679.27. There are [twenty-six] pay periods in a year, and he is paid bi-weekly. This consideration puts Jon on pace to hit $83,887 in 2018.
>
> Jon asks the court consider his income to be only his annual salary of $69,327. Pam requests the court consider Jon's anticipated income. According to Jon's social security earnings statement, he has earned more than his salary amount in the last two years.

Pam has an Ace Body and Motor SEP Plan worth approximately $37,613.89 as of March 31, 2018. This account was worth $50,270.09 as of December 31, 2017. Pam had withdrawn funds from this account to pay her legal fees. She withdrew funds in the total amount of $11,779.72 and received $10,000. The balance was held to pay toward state and federal taxes. This information is confirmed by Pam's testimony and exhibits. Pam testified that she has no pension accounts and that the Ace Body and Motor SEP Account is the only retirement account she has.

Jon has a Thrift Savings Plan with a value of $58,800.19 as of December 31, 2017. Jon offered no updated statements for this account at the time of trial. Jon also has a Federal Employee Retirement System (FERS) pension account. Jon provided a statement to reflect the existence of this account and the anticipated monthly pay-out on the account at retirement. The record supports a finding that Pam does not have a pension account and Jon has this single pension account. The FERS pension account shall be divided using the Benson formula through a QDRO awarding Pam her marital portion of the FERS pension.

Jon also had an Edward Jones traditional IRA account that he cashed out in January 2017 in the amount of $35,861.85. The amount of cash Jon received in January 2017 was $25,103.29. This liquidation was done without Pam's knowledge or consent and was done before the parties separated. Jon testified this money is gone and was used to pay bills during his unemployment and to help other people out. Jon said he did not give any of this money to Pam. Although he seemed to recall putting some of the funds into their joint account, he produced no proof of having done so. Pam testified that she never knew of this liquidation until the days leading up to trial and that Jon had never disclosed this prior to his final discovery supplement.

We reject Jon's complaints about the trial court's valuation of marital property. The trial court provides valid and persuasive reasons for its findings of fact, which we adopt as our own.

The court finds and concludes that it is difficult to value these personal property assets without the appraisals that Jon either did secure and did not provide or promised to secure and failed to obtain. The appraisals would have given an independent valuation of the assets and that would have been more reliable for the court than Jon and Pam's testimony.

Jon was asked about the Blue Book of Gun Values, by S.P. Fjestad (the Blue Book). He said he is aware of the Blue Book and that it is used for valuing firearms. He was asked to look at the value

a specific gun he listed in the Blue Book, which was a HK P7M8 9mm. Jon lists the value of this firearm at $600. The Blue Book lists the value of this firearm at $1,175 at 80% condition—almost twice Jon's estimate of value. With such a disparity in values, the court finds it impossible to believe the values Jon has listed for all of his firearms is accurate. Pam testified that she utilized the Blue Book in assigning value to the firearms that Jon had disclosed to her through discovery.

Jon also failed to produce a list of accessories for his firearms, despite promising through counsel to do so. Jon testified that the accessories he has are minimal and not worth anything. The court cannot rely on what Jon says the items are worth. To do so would be unfairly prejudicial to Pam.

Jon testified that he had not sold, traded or purchased any additional firearms during the pendency of this action. Later in his testimony Jon admitted to selling Pam's handgun for $100 to someone whom he does not recall.

Jon's testimony regarding the value of his tools is even more problematic. Jon did not provide a list of the tools he owns. Jon may think that without providing supporting information, the court will be compelled to accept his values for the firearms, accessories, ammunition, safes and tools. The court finds under this record that Pam provided the more reliable information regarding the value of the firearms, accessories, ammunition, safes and tools. Jon's tools are reasonably valued at $10,000. The firearms, gun accessories, ammunition and three gun safes are reasonably valued at $22,000.

We note particularly the findings concerning Jon's lack of candor and credibility.

We find the district court's valuations were each well within the range of permissible evidence,[5] and we do not disturb the court's credibility findings relating to the valuation of assets. *See In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013).

---

[5] Jon claimed six of the firearms were gifts and should be excluded from the marital property. The trial court noted his argument but included the guns' values. We agree the firearms should be included as marital property because it would be inequitable to exclude them. *See* Iowa Code § 598.21(6) ("[G]ifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division under this section except upon a finding that refusal to divide the property is inequitable to the other party . . . .").

In addition to awarding Pam a portion of Jon's pension, the court awarded Pam marital property valued at $9609.84, while Jon was awarded assets valued at $61,058.41. The difference between the awards is $51,448.57. To equalize the division, the court ordered Jon to pay Pam $25,724.29.

The only significant asset the parties had was the marital home with a value of $254,100,[6] with an encumbrance of $118,975.52. The house was to be sold. The proceeds from the sale were to be used to pay off the parties' one joint credit card (with a balance due of $21,069.70 at time of trial) and provide the equalization payment owed by Jon. The remainder of proceeds was to be divided equally.

After considering the many factors listed in section 598.21A(1), we determine the trial court correctly determined an award to Pam of traditional alimony was warranted. *See Gust*, 858 N.W.2d at 415 (finding "spousal support would be necessary for her to live in a fashion approaching her lifestyle during the marriage"); *see also Mauer*, 874 N.W.2d at 111 (finding "no reason to believe [the wife's] earnings will ever increase such that she will become capable of earning enough to maintain a comparable standard of living to that she enjoyed during her marriage"). Pam leaves this lengthy marriage with no retirement plan of her own and assets of about $80,000. Her current monthly expenses exceed her monthly income by more than $1500.

---

[6] The court valued the house at the amount of the tax assessment. The trial court found, "No better evidence was offered." The court also noted, "Jon testified that he secured a market analysis for the marital home, but that it was in his vehicle and he had not shared this information to his attorney. Jon testified that he thought the market analysis indicated a value of less than the tax assessed value." The court found Jon's assessment not credible.

Jon's income exceeds his monthly expenses and allows him, in his words, "to be a generous person." He testified he has provided a car, groceries, and money to others. He was unable to specify how much he gives away or to whom. Jon has the ability to pay spousal support. *See Gust*, 858 N.W.2d at 411–12. Recognizing that "the trial court was in the best position to balance the parties' needs, and we should intervene on appeal only where there is a failure to do equity," *id.* at 416, we affirm the trial court's award of spousal support and its distribution of the marital property.

Jon complains the trial court abused its discretion in ordering him to pay $5000 toward Pam's trial attorney fees. The trial court reasoned the award was warranted because Pam incurred fees due to Jon not providing promised valuations and not disclosing some of his financial information. "An award of trial attorney fees rests in the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion." *In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997). We find no abuse of discretion here and we affirm the district court's award.

"An award of appellate attorney fees is not a matter of right but rests within our discretion." *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997). We deny Jon's request for appellate attorney fees.

**AFFIRMED.**